**\*NOT FOR PUBLICATION\***

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| DOYLE P. BELMAR, | |
| Plaintiff, | |
| v. | Civil Action No. 20-14477 (FLW) |
| KILOLO KIJAKAZI,<br>Acting Commissioner of Social Security, | **OPINION** |
| Defendant. | |

**WOLFSON, Chief Judge:**

Doyle Belmar ("Plaintiff") appeals from the final decision of the Acting Commissioner of Social Security, Kilolo Kijakazi ("Defendant"), denying Plaintiff's application for disability under Title II of the Social Security Act (the "Act"). After reviewing the Administrative Record (A.R.), the Court finds that the Administrative Law Judge's ("ALJ") decision was based on substantial evidence, and accordingly, the ALJ's decision is **AFFIRMED**.

## I.    FACTUAL AND PROCEDURAL HISTORY

Plaintiff, born on November 29, 1969, was 46 years old on his alleged disability onset date of December 31, 2015. (A.R. 17, 51.) On April 10, 2018, Plaintiff filed a Title II application for a period of disability and disability insurance benefits, alleging disability due to surgeries in both knees and back injuries. (A.R. 17, 52.) The application was filed initially on August 11, 2019, and upon reconsideration on January 18, 2019. (A.R. 17.) Plaintiff then filed a written request for a hearing before an ALJ, which was held on December 19, 2019. (*Id.*) On January 31, 2020, the ALJ determined that Plaintiff was not disabled prior to November 28, 2019, but became disabled

on that date, and remained disabled through the date of the decision. (A.R. 27.) Plaintiff requested review of the ALJ's decision by the Appeals Council, which was denied on August 10, 2020. (A.R. 1.)

## A. Review of Medical Evidence

### i. Medical Records

#### 1. Knee Pain

On August 24, 2014, Plaintiff, while working as a freight elevator operator, sustained physical injuries when a work elevator dropped six floors without warning. (A.R. 270.) On September 18, 2014, Plaintiff visited Dr. Kevin Wright, M.D., complaining of back and bilateral knee pain. (*Id*.) Dr. Wright prescribed Naprosyn, a cane, and physical therapy. (A.R. 271-72.) When Plaintiff returned on September 25, Dr. Wright noted the range of motion in his right knee was limited to 90 degrees, and that he had medial and lateral joint line tenderness and a positive McMurray's test. (A.R. 310.) Dr. Wright's records reflect that Plaintiff was scheduled to begin physical therapy the following week and that Plaintiff had a "temporary total disability." (*Id*.)

On November 13, 2014, Plaintiff underwent an MRI of his right knee, which showed an oblique undersurface tear of the posterior and anterior horn of the medial meniscus and joint effusion. (A.R. 274.) The next day, Plaintiff underwent an MRI of his left knee, which showed flap tears of the undersurfaces of the anterior and posterior horns of the medial meniscus, partial tears of the anterior and posterior cruciate ligaments, and joint effusion. (A.R. 273.) On November 20, 2014, Plaintiff underwent nerve conduction studies and an electromyography, which determined that there was electrophysiological evidence of a bilateral L4-L5 radiculopathy. (A.R. 339-41.)

On December 5, 2014, Plaintiff returned to Dr. Wright and reported persistent right knee pain that was exacerbated by activity. (A.R. 267.) Dr. Wright noted that Plaintiff attended physical therapy and was taking nonsteroidal anti-inflammatory medication, but was not improving. (*Id.*) Dr. Wright opined that Plaintiff would benefit from a knee arthroscopy, and noted that Plaintiff was not currently working as he was temporarily totally disabled. (*Id.*) After additional visits to Dr. Wright between January and April 2015, Dr. Wright performed arthroscopic surgery on Plaintiff's right knee in May 2015. (A.R. 294.) At a follow up visit in August 2015, Dr. Wright noted that Plaintiff's range of motion in his knee was from 0 to 115 degrees in his right knee, and 0 to 100 degrees in his left knee. (A.R. 262.) Plaintiff was given a knee brace, which Plaintiff reported as providing excellent support for his right knee and eliminated his discomfort. (*Id.*) Dr. Wright also provided Plaintiff with a letter allowing him to return to work. (A.R. 263.) In September 2015, Plaintiff complained of knee pain that was exacerbated by activity. (A.R. 264.) Plaintiff reported attending physical therapy and using a knee brace, which were beneficial, although, his knee brace had been stolen at work. (*Id.*) When Plaintiff visited Dr. Wright in December 2015, Dr. Wright stated that Plaintiff had returned to work, but the frequent stops of the elevator he worked on exacerbated his bilateral knee pain. (A.R. 296.) Dr. Wright assessed that Plaintiff had failed to improve with conservative treatment, and noted that Plaintiff had a temporary partial disability that was moderate in nature. (A.R. 296-97.) At this visit, Dr. Wright also recommended surgery on Plaintiff's left knee, which surgery Dr. Wright performed in April 2016. (A.R. 296, 299.)

After his left knee surgery, in June and July 2016, Plaintiff reported "significant improvement in the way his knee feels" to Dr. Wright. (A.R. 293, 314.) Plaintiff complained of mild pain when standing for long periods of time, and when kneeling. (A.R. 293.) Upon

examination, Dr. Wright noted that Plaintiff's range of motion was 0 to 118 degrees, and his knee strength was a 4/5. (*Id*.) Dr. Wright stated that he believed Plaintiff would be able to lift heavy objects and stand for long periods of time, as his job required, after building up his strength and endurance. (A.R. 293, 314.) In September 2016, Plaintiff reported doing physical therapy and home exercises, and noted significant improvement in his knee. (A.R. 392.) Despite the improvement, Dr. Wright believed that Plaintiff would benefit from an additional course of therapy to strengthen his knees. (*Id*.) Dr. Wright also stated that Plaintiff was not currently working and had a temporary total disability. (A.R. 393.) In November 2016, Plaintiff again reported significant improvement in his left knee, and Dr. Wright gave him a pain injection in his right knee. (A.R. 394.) The following month, Plaintiff noted improvement in his right knee, and that physical therapy had been beneficial. (A.R. 318.) In July, September, and November 2017, and February 2018, Plaintiff reported that his left knee was doing well, and Dr. Wright found Plaintiff's left knee was not tender and had 5/5 strength, and his right knee had some tenderness and 4/5 strength. (A.R. 279, 282, 284, 286.) However, in September 2017, Plaintiff reported that he was unable to return to work as a freight elevator operator, and he was terminated from his employment. (A.R. 284.)

While being treated for knee pain, Plaintiff also visited Tamer Elbaz, M.D., at Pain Physicians NY PLLC for pain management. In January 2017, Dr. Elbaz treated Plaintiff for lower back and knee pain. (A.R. 396-97.) Dr. Elbaz reported that Plaintiff had decreased range of flexion, extension, and lateral flexion of the lumbar spine, 4/5 motor strength in all muscle groups, decreased sensation in the right thigh and foot, and straight leg raising was positive at 30 degrees. (A.R. 397.) Dr. Elbaz also reported swelling in Plaintiff's right knee and aggravated pain from bending forward, prolonged standing, walking, and sitting. (*Id*.) In February 2017, Dr. Elbaz gave

Plaintiff a steroid injection in his right knee.  (A.R. 398-99.)  In April 2017, Dr. Elbaz recommended physical therapy 2-3 times per week for 6-8 weeks to improve strength and increase range of motion.  (A.R. 402.)  Throughout 2017, Plaintiff reported to Dr. Elbaz that he continued to attend physical therapy with mild improvement and that he was taking Tramadol for pain.  (A.R. 404, 408, 409-11.)  In April 2018, Dr. Elbaz stated that Plaintiff's medication provided moderate relief without side effects.  (A.R. 456.)  In October and November 2017, Plaintiff visited Dr. Elbaz for follow up treatment, and Dr. Elbaz renewed Plaintiff's Tramadol and cautioned Plaintiff that Tramadol could cause drowsiness and sedation.  (A.R. 408-13, 416.)

### 2.  Spinal Surgery

In September 2016, Andrew Merola, M.D., performed spine surgery on Plaintiff's lumbar spine at L4-L5.  (A.R. 343-44.)  Later, in February 2018, Plaintiff returned to Dr. Merola, who noted that Plaintiff's low back pain had gotten worse.  (A.R. 320.)  Dr. Merola recommended a second lumbar surgery with a spinal fusion, again at L4-L5.  (A.R. 320-27.)  Plaintiff underwent a lumbar laminectomy on June 5, 2018.  (A.R. 481.)  In July 2018, at a follow up visit, Plaintiff reported a normal gait and stable neurological function in his arms and legs.  (A.R. 324.)  In August 2018, Plaintiff reported improvement of the shooting pain down his legs, but that he still felt shooting pain in his right lower extremity.  (A.R. 457.)  Plaintiff also complained of difficulty with daily living activities, and he wore a lumbar brace.  (*Id*.)  In November 2019, Dr. Merola stated that Plaintiff's back surgery had prevented further significant pain in his arms and legs.  (A.R. 483.)

### 3.  Plaintiff's Rehabilitation

Plaintiff visited Douglas Schwartz, D.O., in November 2018, for a follow up evaluation after his June back surgery.  (A.R. 474.)  Plaintiff reported that his pain was a 4 out of 10, and that

he was independent in getting dressed and undressed for his lower and upper extremities, feeding, grooming, personal hygiene.  (*Id*.)  Further, Plaintiff had arrived that day by taking the subway and bus.  (*Id*.)  Plaintiff also walked without an assisted device.  (A.R. 475.)  Dr. Schwartz stated that Plaintiff should attend physical therapy 2-3 times per week in conjunction with aerobic conditioning to help control symptoms.  (*Id*.)  In May 2019, Plaintiff visited Dr. Schwartz again to restart his physical therapy, reporting pain of a 5.5 on a scale of 10.  (A.R. 493.)  Plaintiff remained independent in dressing, feeding, grooming, and personal hygiene.  (*Id*.)  Dr. Schwartz, again, recommended physical therapy 2-3 times per week with aerobic conditioning.   (A.R. 494.)  Plaintiff gave varying pain assessments to Dr. Schwartz later in 2019, including his pain being a 6 out of 10 in July, 4 out of 10 in September, and 5 out of 10 in November.  (A.R. 487-91.)  At the November visit, Plaintiff reported intermittent numbness and tingling in his left leg, general pain in his knees, and low back pain with stiffness, tightness, and muscle spasms.  (A.R. 487.)

## B. Consultative Medical Evidence

Plaintiff had an orthopedic consultation with Dr. Jerome Rosman, M.D., in November 2018.  (A.R. 250.)  At the consultation, Plaintiff complained of pain, tenderness, numbness, burning, and tingling in the back and knees.  (*Id*.)  Plaintiff also reported having difficulty sleeping, walking, lifting, standing, and bending.  (*Id*.)  Upon physical examination, Dr. Rosman noted that Plaintiff was unable to walk on his heels and toes, had difficulty getting on and off the examining table, and demonstrated a shuffling gait.  (*Id*.)  Examination of each knee revealed a normal range of motion, no tenderness, heat, swelling, erythema, or effusion, negative abduction and adduction stress tests, a negative Lachman sign, and a negative McMurray test.  (*Id*.)  Dr. Rosman found Plaintiff's motor strength was normal in Plaintiff's lower extremities at the quadriceps, hamstrings, and calf.  (*Id*.)  Dr. Rosman also stated that Plaintiff's flexion of his lumbar spine was limited to

10 degrees (90 degrees is normal). (*Id*.) Further, Plaintiff's lumbar spine extension, lateral bending, and lateral rotation were all 0 degrees (30 degrees is normal). (*Id*.) Dr. Rosman found that there was paravertebral tenderness and spasm, but his straight leg raise was negative in the sitting position bilaterally. (*Id*.) After this examination and reviewing the medical records, Dr. Rosman diagnosed Plaintiff with a thoracolumbar sprain, left knee sprain, right knee sprain, and status-post lumbar laminectomy with post-operative infection. (A.R. 252.) Dr. Rosman also determined that Plaintiff had reached his maximum medical improvement as to his left knee, but that he had not yet reached his maximum medical improvement as to his lumbar spine. (*Id*.) Dr. Rosman assessed that Plaintiff's current degree of disability was total, and that he was not able to return to work in any capacity. (*Id*.)

Plaintiff visited Dr. Rosman again in June 2019. (A.R. 477.) At the visit, Plaintiff complained of tenderness, pain, numbness, burning, and tingling in his back and right knee. (*Id*.) Plaintiff also reported having difficulty sleeping, walking, lifting, standing, and bending. (*Id*.) In Plaintiff's physical examination, Dr. Rosman observed that Plaintiff was able to walk on his heels and toes without difficulty, could get on and off the examining table unassisted, and demonstrated normal gait. (A.R. 478.) Examination of both knees revealed a normal range of motion, no tenderness, heat, swelling, erythema, or effusion, negative abduction and adduction stress tests, a negative Lachman sign, and a negative McMurray test. (*Id*.) The range of motion in Plaintiff's lumbar spine revealed flexion of 20 degrees (normal is 90 degrees). (*Id*.) Further, Dr. Rosman found Plaintiff's lumbar extension, lateral bending, and lateral rotation to be 20 degrees (normal is 30 degrees). (*Id*.) Dr. Rosman also noted paravertebral tenderness on palpation, pain with motion, but no spasm, and his straight leg raise was negative in the bilateral position. (*Id*.) Dr.

Rosman also stated that Plaintiff's motor strength was normal in his lower extremities, but his deep tendon reflexes in these extremities were depressed at the knees and normal at the ankles. (*Id*.)

In November 2019, Plaintiff underwent a functional capacity evaluation with Dr. Merola. (A.R. 483.) Dr. Merola stated that, overall, surgical intervention in Plaintiff's lower back had been helpful in terms of preventing further significant and severe shooting pain into his extremities, but Plaintiff did continue to have mechanical axial symptoms. (*Id*.) Plaintiff reported that he continued to have pain in his low back, particularly with bending, lifting, and twisting, for which he continues to utilize muscle relaxers. (*Id*.) Plaintiff complained that he had difficulty putting on shoes and socks, and some difficulty with personal care and hygiene. (*Id*.) Further, Plaintiff stated that he utilized private transportation to get to the office, and he only occasionally uses a cane and/or brace. (*Id*.) After examination, Dr. Merola stated that Plaintiff had a permanent impairment in his lower back. (*Id*.) Regarding Plaintiff's functional capability assessment, Dr. Merola determined that Plaintiff was able to lift and carry up to five pounds occasionally, push and pull up to five pounds occasionally, sit and stand occasionally, walk occasionally, never climb, kneel, bend, stoop or squat, perform simple grasping occasionally, perform fine manipulation occasionally, never reach overhead, never reach at or below shoulder level, occasionally drive a vehicle, never operate machinery, never be exposed to temperature extremes or high humidity, and never be exposed to environmental hazards. (*Id*.) Dr. Merola then stated that these limitations "place[] this gentlemen into a category of sedentary work." (*Id*.) Dr. Merola opined that while Plaintiff cannot perform his current work even with these restrictions, Plaintiff could perform other work activities so long as these significant limitations were in place. (*Id*.)

### C. State Agency Medical Opinions

In August 2018, on initial review, state medical expert Nancy Simpkins, M.D., reviewed Plaintiff's medical records and found him not disabled.  (A.R. 57.)  Dr. Simpkins determined that Plaintiff had exertional limitations of occasionally lifting or carrying 20 pounds, frequently lifting or carrying 10 pounds, standing or walking for 4 hours a day, sitting for 6 hours a day, and unlimited ability to push or pull.  (A.R. 55.)  In addition, Dr. Simpkins found Plaintiff could occasionally climb ramps and ladders, balance, stoop, kneel, crouch, and crawl, and that Plaintiff had no manipulative, visual, communicative, or environmental limitations.  (A.R. 56.)  Dr. Simpkins also determined that based on Plaintiff's strength limitations, Plaintiff demonstrated the capacity to perform sedentary work.  (A.R. 57.)  Although Dr. Simpkins did not determine whether Plaintiff had the capacity to perform his past relevant work, Dr. Simpkins noted this was immaterial because potentially applicable vocational guidelines would direct a finding of not disabled given Plaintiff's age, education, and RFC.  (*Id*.)  For this reason, Dr. Simpkins stated Plaintiff could adjust to other work.  (*Id*.)

In January 2019, on reconsideration, Joseph Udomsaph, M.D., also found that Plaintiff was not disabled.  (A.R. 68.)  In finding Plaintiff not disabled, Dr. Udomsaph determined that, although Plaintiff presently had a medically determinable impairment that met listing 1.04A, with time, pain care, and physical therapy, Plaintiff's impairment would be improved so as to be consistent and compatible with Dr. Udomsaph's proposed RFC.  (A.R. 67.)  This proposed RFC stated that Plaintiff had exertional limitations of occasionally lifting or carrying 20 pounds, frequently lifting or carrying 10 pounds, standing or walking for 4 hours a day, sitting for 6 hours a day, and unlimited ability to push or pull.  (A.R. 66.)  Dr. Udomsaph also stated that Plaintiff could occasionally climb ramps or stairs, stoop, kneel, crouch, and crawl, could frequently balance, but

never climb ladders.  (A.R. 66-67.)  In addition, Dr. Udomsaph found that Plaintiff had no manipulative, visual, communicative, or environmental limitations.  (A.R. 67.)  Dr. Udomsaph determined that based on Plaintiff's strength limitations, Plaintiff would have the capacity to perform sedentary work.  (A.R. 68.)

Additionally, although Dr. Udomsaph did not determine whether Plaintiff had the capacity to perform his past relevant work, Dr. Udomsaph noted this was immaterial because potentially applicable vocational guidelines would direct a finding of not disabled given Plaintiff's age, education, and RFC.  (A.R. 67.)  For this reason, Dr. Udomsaph stated Plaintiff could adjust to other work.  (*Id*.)

### D.  Review of Testimonial Evidence

#### i.  Plaintiff's Testimony

At the hearing, Plaintiff stated that he has a high school education, and lives with his wife, son, and daughter.  (A.R. 38-39.)  Plaintiff testified that he has a driver's license, and that he typically drives only short distances, such as to go to the pharmacy to pick up medications.  (A.R. 39.)  Plaintiff also explained that his prior work was as a freight elevator operator and porter.  (A.R. 40.)

Regarding his lower back pain, Plaintiff rated his daily pain as a seven or eight out of ten. (*Id*.)  In terms of treatment, Plaintiff stated that he has had two surgeries, and also has done acupuncture and heat massages.  (*Id*.)  Plaintiff claimed that ultimately, these surgeries had no effect on his back.  (A.R. 41.)  Regarding his knee pain, Plaintiff rated his daily pain as a seven or eight out of ten for both knees.  (*Id*.)  Plaintiff noted that he is taking pain medication and injections for his knee pain.  (*Id*.)  According to Plaintiff, the pain medications, which he takes three or four times a day, make him dizzy, sleepy, drowsy, and give him headaches.  (*Id*.)  Plaintiff also noted

that the injections only relieve the pain "a little bit" for two or three days before the pain returns. (A.R. 42.)  Due to the pain in his lower back and knees, Plaintiff explained that he could only sit comfortably for about fifteen or twenty minutes before he has to change position or stand up, which is due to the numbness and tingling he experiences in his lower back and legs.  (A.R. 42-43.)  Similarly, Plaintiff stated he can only stand for fifteen or twenty minutes before needing to sit down or lean on something due to pain.  (A.R. 43.)  In that connection, Plaintiff noted that he cannot do chores around the house, and cannot prepare meals for himself.  (A.R. 44.)  Plaintiff stated that he passed time by sitting or lying down on his couch or bed and watching television, listening to the radio, and reading books.  (*Id*.)

### ii. Vocational Expert's Testimony

The Vocational Expert, Tanya Edgehill ("VE"), began by classifying Plaintiff's past job as a composite job.  (A.R. 46.)  The VE stated that the composite job includes the job of "freight elevator operator," which has a DOT number of 921.683-038, and is a heavy exertion job with a Specific Vocational Preparation ("SVP") of 2, as well as the job of "floor cleaner," which has a DOT number of 381.687-018, and is a medium exertion job with an SVP of 2.  (*Id*.)

The ALJ then proceeded to ask the first hypothetical:

> [P]lease assume an individual with the same age, education, and past work experience as that of the claimant.  To further assume that the individual would be limited to the light occupational base, with the following additional limitations.  The individual would only occasionally be able to climb ramps and stairs; stoop, knee, crouch, balance, or crawl.  Could never climb ladders, ropes, or scaffolds.  Would only be able to occasionally push or pull controls with the lower extremities.  And would require a sit/stand option whereby the individual would be able to stand for a maximum of one hour at a time before needing to sit or change positions for two to three minutes.  With just those limitations, could such an individual perform the past work that you classified for me?

(*Id*.)  The VE replied, "No, your Honor, the past work was more than light work." (*Id*.)  The ALJ then asked if, given these limitations, there were any jobs existing that such an individual could

perform.  (*Id*.)  The VE explained that with light jobs, there is no option to sit or stand, and as such, the person must be able to stand as often as the employer needs the person to, so the person could only sit every two to three minutes to rest.  (*Id*.)  In sum, the VE stated there would be no jobs available for such a hypothetical person.  (A.R. 47.)

The ALJ then asked if the hypothetical person was "now 50 years of age, from that point on, would there be any transferable skills from past work to the sedentary occupational base?" (*Id*.)  The VE replied, "No, . . . as the past work were all simple, unskilled jobs."  (*Id*.)  The ALJ followed up by asking if the hypothetical individual was limited to:

> Sedentary work, and this is prior to age 50, and I were to again ask you to assume that the individual would be able to sit for up to six hours, but for no more than one hour at a time before needing to stand or shift positions for two to three minutes, and everything that we discussed in the first hypothetical, and I can repeat it, that is the occasional climbing and all, would still be present.  Would there be any representative jobs that you could provide me that would accommodate for these limitations?

(*Id*.)  The VE replied, "Yes, . . . if someone could sit a straight hour before having to change positions to two to three minutes, there are jobs that meet these limitations."  (*Id*.)  The VE stated that these jobs would include: (1) "assembler," DOT number 739.687-066, which has a sedentary exertion level with an SVP of 2; (2) "table worker," DOT number 739.687-182, which has a sedentary exertion level with an SVP of 2; (3) "preparer," DOT number 249.587-018, which has a sedentary exertion level with an SVP of 2.  (A.R. 47-48.)

The ALJ then asked if he were to add to the hypothetical that the individual "would be off task let's say 15 percent of a workday, due to pain, would any of the representative jobs that you provided me still exist?"  (A.R. 48.)  The VE responded that there would be no jobs available with a 15 percent off task time.  (*Id*.)  The ALJ also asked whether an individual absent from work three

or more times per month could work any of the jobs provided by the VE, to which the VE replied no. (*Id*.)

Plaintiff's attorney then asked the VE whether a hypothetical person limited to lifting and carrying a five-pound maximum would be able to do the sedentary jobs, to which the VE replied, "[Y]ou need to be able to lift up to ten pounds. So, that would preclude sedentary work." (*Id*.)

### E. ALJ Opinion

On January 31, 2020, the ALJ issued a written decision analyzing whether Plaintiff satisfied his burden to demonstrate disability using the standard five-step process. (A.R. 16-27.) At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since his alleged onset date of disability. (A.R. 19.) At step two, the ALJ found that since the alleged onset date, Plaintiff's status post lumbar laminectomy decompression and fusion at L4-L5 and bilateral knee derangement were severe impairments. (A.R. 20.) At step three, the ALJ determined that "[s]ince December 31, 2015, the [Plaintiff] has not had an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments" in the relevant CFR. (*Id*.) In so deciding, the ALJ specifically considered listings 1.02 and 1.04. (*Id*.)

The ALJ then determined that Plaintiff, since December 31, 2015, had the residual functional capacity ("RFC") to perform sedentary work, except Plaintiff can sit up to six hours per day, but no more than one hour at a time, and then would need to stand/shift positions for two to three minutes while remaining on task. (*Id*.) Further, Plaintiff could occasionally climb ramps/stairs, stoop, kneel, crouch, balance or crawl; and never climb ladders, ropes or scaffolds. (*Id*.) Plaintiff also is able to occasionally push/pull controls with his lower extremities. (*Id*.) At step four, the ALJ determined that Plaintiff is unable to perform any past relevant work. (A.R. 25.) At step five, the ALJ determined that "[p]rior to November 28, 2019, the date [Plaintiff's]

age category changed, considering [Plaintiff's] age, education, work experience, and [RFC], there were jobs that existed in significant numbers in the national economy that [Plaintiff] could have performed." (A.R. 26.)  But, the ALJ also found that "[b]eginning on November 28, 2019, the date [Plaintiff's] age category changed, considering the claimant's age, education, work experience, and residual functional capacity, there are no jobs that exist in significant numbers in the national economy that [Plaintiff] could perform." (A.R. 27.)  As such, the ALJ determined that Plaintiff was not disabled prior to November 28, 2019, but became disabled on that date, and has continued to be disabled through the date of the ALJ's decision.  (*Id*.)

## II.   <u>STANDARD OF REVIEW</u>

On a review of a final decision of the Commissioner of the Social Security Administration, a district court "shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g); *see Matthews v. Apfel*, 239 F.3d 589, 592 (3d Cir. 2001).  The Commissioner's decisions regarding questions of fact are deemed conclusive on a reviewing court if supported by "substantial evidence in the record." 42 U.S.C. § 405(g); *see Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).  While the court must examine the record in its entirety for purposes of determining whether the Commissioner's findings are supported by substantial evidence, *Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978), the standard is highly deferential.  *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004).  Indeed, "substantial evidence" is defined as "more than a mere scintilla," but less than a preponderance. *McCrea v. Comm'r of Soc. Sec.*, 370 F.3d 357, 360 (3d Cir. 2004).  "It means such relevant evidence as a reasonable mind might accept as adequate." *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999) (internal quotations and citations omitted).  A reviewing court is not "empowered

to weigh the evidence or substitute its conclusions for those of the fact-finder." *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992), *cert. denied*, 507 U.S. 924 (1993).  Accordingly, even if there is contrary evidence in the record that would justify the opposite conclusion, the Commissioner's decision will be upheld if it is supported by the evidence.  *See Simmonds v. Heckler*, 807 F.2d 54, 58 (3d Cir. 1986).

Disability insurance benefits may not be paid under the Act unless Plaintiff first meets the statutory insured status requirements.  *See* 42 U.S.C. § 423(c).  Plaintiff must also demonstrate the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." *Id*. § 423(d)(1)(A); *see Plummer*, 186 F.3d at 427.  An individual is not disabled unless "his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]"  *Id*. § 423(d)(2)(A). Eligibility for supplemental security income requires the same showing of disability.  *Id*. § 1382c(a)(3)(A)-(B).

The Act establishes a five-step sequential process for evaluation by the ALJ to determine whether an individual is disabled.  *See* 20 C.F.R. § 404.1520.  First, the ALJ determines whether the claimant has shown that he or she is not currently engaged in "substantial gainful activity." *Id*. § 404.1520(a)(4)(i); *see Bowen v. Yuckert*, 482 U.S. 137, 146-47 n.5 (1987).  If a claimant is presently engaged in any form of substantial gainful activity, he or she is automatically denied disability benefits.  *See id*. § 404.1520(b); *see also Bowen*, 482 U.S. at 140.  Second, the ALJ determines whether the claimant has demonstrated a "severe impairment" or "combination of

impairments" that significantly limits his physical or mental ability to do basic work activities. *Id*. § 404.1520(c); *see Bowen*, 482 U.S. at 146-47 n.5. Basic work activities are defined as "the abilities and aptitudes necessary to do most jobs." *Id*. § 404.1522(b). These activities include physical functions such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling." *Id*. § 404.1522(b)(1). A claimant who does not have a severe impairment is not considered disabled. *Id*. at § 404.1520(c); *see Plummer*, 186 F.3d at 428.

Third, if the impairment is found to be severe, the ALJ then determines whether the impairment meets or is equal to the impairments listed in 20 C.F.R. Pt. 404, Subpt. P., App. 1 (the "Impairment List"). *Id*. § 404.1520(a)(4)(iii). If the claimant demonstrates that his or her impairments are equal in severity to, or meet those on the Impairment List, the claimant has satisfied his or her burden of proof and is automatically entitled to benefits. *See id*. § 404.1520(d); *see also Bowen*, 482 U.S. at 146-47 n.5. If the specific impairment is not listed, the ALJ will consider in his or her decision the impairment that most closely satisfies those listed for purposes of deciding whether the impairment is medically equivalent. *See id*. § 404.1526(a). If there is more than one impairment, the ALJ then must consider whether the combination of impairments is equal to any listed impairment. *Id*. An impairment or combination of impairments is basically equivalent to a listed impairment if there are medical findings equal in severity to all the criteria for the one most similar. *Williams*, 970 F.2d at 1186. If the claimant is not conclusively disabled under the criteria set forth in the Impairment List, step three is not satisfied, and the claimant must prove at step four whether he or she retains the RFC to perform his or her past relevant work. 20 C.F.R. § 404.1520(e); *Bowen*, 482 U.S. at 141.

If the claimant can perform past relevant work, the claimant is determined to not be disabled. 20 C.F.R. §§ 404.1520(e), 416.920(e); *Bowen*, 482 U.S. at 141-42. The claimant bears

the burden of demonstrating an inability to return to the past relevant work. *Plummer*, 186 F.3d at 428. Finally, if it is determined that the claimant is no longer able to perform his or her past relevant work, the burden of production then shifts to the Commissioner to show, at step five, that the "claimant is able to perform work available in the national economy." *Bowen*, 482 U.S. at 146-47 n.5; *Plummer*, 186 F.3d at 428. This step requires the ALJ to consider the claimant's RFC, age, education, and past work experience. 20 C.F.R. § 404.1520(a)(4)(v). The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether the claimant can perform work and not disabled. *Id*.

## III.   PLAINTIFF'S CLAIMS ON APPEAL

First, Plaintiff maintains that the evidence cited by the ALJ for the period prior to November 28, 2019, does not support a determination that Plaintiff could perform sedentary work, and as such, the ALJ's RFC assessment is not based on substantial evidence. Pl. Br. at 12-15. Second, Plaintiff argues that the ALJ inappropriately failed to consider how Plaintiff's subjective complaints regarding the side effects of his medication affected his ability to work. Pl. Br. at 15-16.

### A.   The ALJ's RFC Determination is Based on Substantial Evidence

Plaintiff contends that "none" of the evidence cited by the ALJ supports the ALJ's conclusion that Plaintiff retained the capacity for sedentary work, and proceeds to list a variety of evidence indicating that Plaintiff was, in fact, disabled. Pl. Br. at 12-13. Specifically, Plaintiff asserts that both Dr. Rosman's independent medical reports, which opined that Plaintiff had numerous limitations, and Dr. Merola's November 2019 functional report, which Plaintiff argues contains findings that preclude Plaintiff from sedentary work, are proof that Plaintiff could not perform sedentary work. Pl. Br. at 14. Further, Plaintiff notes that state agency medical consultant

Dr. Udomsaph found Plaintiff to meet listing 1.04A, but inappropriately "predicted" that Plaintiff would recover in 12 months.  Pl. Br. at 13-14.

"[RFC] is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s)."  *Burnett v. Comm'r of Social Sec. Admin.*, 220 F.3d 112, 121 (3d Cir. 2000) (quoting *Hartranft v. Apfel*, 181 F.3d 358, 359 n.1 (3d Cir. 1999)); *see* 20 C.F.R. § 404.1545(a).  When a case is brought to an administrative hearing, the ALJ "is responsible for assessing [] residual functional capacity."  20 C.F.R. § 404.1546(c).  This means that the "ALJ— not treating or examining physicians or State agency consultants—must make the ultimate disability and RFC determinations."  *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011).  In making an RFC determination, "the ALJ must consider all evidence before him," and, although the ALJ may weigh the credibility of the evidence, he must "give some indication of the evidence which he rejects and his reason(s) for discounting such evidence."  *Burnett*, 220 F.3d at 121; *see Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).  Further, "[w]here the ALJ's findings of fact are supported by substantial evidence, [district courts] are bound by those findings, even if [the courts] would have decided the factual inquiry differently."  *Hagans v. Comm'r of Soc. Sec.*, 694 F.3d 287, 292 (3d Cir. 2012) (internal quotation marks and citation omitted).

Here, the ALJ's RFC decision was based on substantial evidence in the record.  In making the RFC finding, the ALJ "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence[,]" as well as "the medical opinion(s) and prior administrative medical findings[.]"  (A.R. 20.)  Ultimately, the ALJ determined that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not fully supported" by the record, and as

such, "the symptoms do not cause the degree of limitation alleged." (A.R. 24.) In so doing, the ALJ extensively reviewed the medical and testimonial evidence, which included a detailed review of Plaintiff's work history, medical treatments, surgeries, physical therapy, and medication use. (A.R. 20-25.)

Notably, the ALJ's Opinion expressly reviewed, in detail, the medical evidence upon which Plaintiff relies in arguing that he could not perform sedentary work. For example, after stating that "none" of the ALJ's evidence supports a sedentary work capacity, Plaintiff cherry-picks certain functional findings in Dr. Rosman's treatment notes, such as that Plaintiff had limited range of motion in his spine, as well as other movement difficulties, as proof that Plaintiff could not perform sedentary work. Pl. Br. at 12-13. But the ALJ's Opinion, appropriately, considered the entirety Dr. Rosman's independent medical evaluations in November 2018 and February 2019, where Plaintiff showed improvement between evaluations, and determined that Plaintiff was, indeed, capable of sedentary work.[1] (A.R. 22-24.) The ALJ noted that Dr. Rosman's November 2018 evaluation indicated Plaintiff complained of pain, tenderness, numbness, burning, and tingling in his back and knees, which made it difficult for Plaintiff to sleep, walk, lift, stand, and bend. (A.R. 22.) The evaluation also explained that Plaintiff was unable to walk on his heels and toes, had difficulty getting on and off the examining table, and he had a shuffling gait pattern. (A.R. 22-23.) The ALJ stated that upon examination, although Plaintiff had a decreased range of motion in his right knee, he had no tenderness, heat, swelling, erythema, or effusion, and both his Lachman sign and McMurray test were negative. (A.R. 23.) The examination also revealed that Plaintiff had full range of motion in his left knee, with no tenderness, heat, swelling, erythema, or effusion,

---

[1] The ALJ misidentified these evaluations as the findings of "Dr. Rubinfeld." It appears from the letterhead of the evaluations that Dr. Rubinfeld and Dr. Rosman work together. (A.R. 250, 480.)

and negative Lachman sign and McMurray test.  (*Id*.)  As to his spine, the ALJ stated that Dr. Rosman opined that there was decreased range of motion in Plaintiff's thoracolumbar spine and paravertebral tenderness, as well as spasms.  (*Id*.)  However, Plaintiff's straight leg raise was negative, and Dr. Rosman noted that Plaintiff's motor strength was normal in his quadriceps, hamstrings, calf, and extensor hallucis longus muscles.  (*Id*.)  The ALJ noted that Dr. Rosman's ultimate diagnoses were thoracolumbar sprain, left knee sprain, right knee sprain, and status-post lumbar laminectomy with post-operative infection.  (*Id*.)  Examining Dr. Rosman's February 2019 evaluation, the ALJ noted that Plaintiff was now able to walk on his heels and toes without difficulty, was able to get on and off the examining table unassisted, and demonstrated a normal gait pattern.  (*Id*.)  Further, in both of Plaintiff's knees, he had 0 to 130 degrees of motion (with 140 degrees being normal), no instability, tenderness, swelling, erythema, or effusion.  (*Id*.)  Lachman sign and McMurray test were also negative in both knees.  (*Id*.)  As to his spine, the ALJ noted that although Plaintiff had decreased motion in his thoracolumbar spine, paravertebral tenderness on palpation, and pain with motion, Plaintiff did not have spasms.  (*Id*.)  The evaluation also determined that Plaintiff's motor strength was still normal in his quadriceps, hamstrings, calf, and extensor hallucis longus muscles.  (*Id*.)  Dr. Rosman diagnosed Plaintiff with thorocolumbar sprain, left knee sprain, right knee sprain, and status-post lumbar laminectomy.  (A.R. 23-24.)  This thorough examination of Dr. Rosman's evaluations makes clear that the ALJ properly considered these evaluations in determining, based on substantial evidence, that Plaintiff was capable of sedentary work.

The ALJ also considered Dr. Merola's November 2019 functional evaluation, and noted that Dr. Merola determined that Plaintiff:

> was able to lift/carry up to five pounds occasionally; push and pull up to five pounds occasionally; sit occasionally; stand occasionally; walk occasionally; never climb,

kneel, bend, stoop or squat; perform simple grasping occasionally; perform fine manipulation occasionally; never reach overhead; never reach at or below shoulder level; occasionally drive a vehicle; never operate machinery; never be exposed to temperature extremes or high humidity; and never be exposed to environmental hazards.

(A.R. 24.)  Dr. Merola went on to opine that, so long as these functional limitations were in place, Plaintiff was capable of performing work activities.  (A.R. 484.)  Notably, although Plaintiff argues that Dr. Merola's limitation findings are proof that Plaintiff cannot perform sedentary work, since sedentary work requires the ability to lift 10 pounds and repetitive use of hands and fingers, Plaintiff ignores, and the ALJ notes, that Dr. Merola's functional capacity assessment ultimately concludes that these limitations "place[] this gentlemen into a category of sedentary work."  (A.R. 24, 484.)  Upon review, the ALJ determined that Dr. Merola's opinion was somewhat persuasive, "particularly with regard to sedentary exertional work."  (A.R. 25.)

Finally, the ALJ also considered the state agency medical consultant opinions, Drs. Simpkins and Udomsaph,[2] who both found Plaintiff was not disabled, and that Plaintiff was capable of performing sedentary work.  (A.R. 25, 57, 68.)  Both state agency experts also determined that Plaintiff was capable of standing for 4 hours per day, sitting for 6 hours a day, occasionally lifting or carrying 20 pounds, and frequently lifting or carrying 10 pounds.  (A.R. 55, 66.)  The ALJ found the state agency opinions to be partially persuasive in that they were supported

---

[2] As explained *supra*, Dr. Udomsaph determined that at the time of his evaluation, Plaintiff met listing 1.04A, but that with time, pain care, and physical therapy, Plaintiff would not be disabled in 12 months.  (A.R. 67.)  Because establishing a disability requires a finding that a claimant's impairment will preclude the claimant from substantial gainful activity for a twelve-month period, Dr. Udomsaph found that Plaintiff was not disabled.  (*Id.*; *see Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 545 (3d Cir. 2003) ("In order to establish a disability under the Social Security Act, a claimant must demonstrate that there is some medically determinable basis for an impairment that prevents him from engaging in any substantial gainful activity for a statutory twelve-month period." (internal quotations omitted)); 42 U.S.C. § 423(d)(1)(A).)

by medical evidence that Plaintiff is capable of performing sedentary work with postural limitations.  (A.R. 25.)  Notably, Plaintiff argues, referring to Dr. Udomsaph's opinion, that the "ALJ erred in relying on the speculative prediction [of a] non-examining, non-treating state agency physician" that although Plaintiff was disabled at the time of the evaluation, Plaintiff would improve in 12 months to the level of the RFC.  Pl. Br. at 13-14.  As an initial matter, even if Dr. Udomsaph never made this "prediction" and had simply found Plaintiff disabled, the "ALJ—not treating or examining physicians or State agency consultants—must make the ultimate disability and RFC determinations[,]" and as such, such an opinion would not have automatically rendered Plaintiff disabled.  *Chandler*, 667 F.3d at 361.  In that connection, the ALJ did not rely solely on Dr. Udomsaph's "prediction," as the ALJ found the opinion only partially persuasive, in that it was supported by other medical evidence that Plaintiff was capable of sedentary work with postural limitations.  (A.R. 25.)  In other words, even though Dr. Udomsaph claimed that Plaintiff met listing 1.04A as of January 2019, the ALJ discounted that portion of Dr. Udomsaph's findings because, based on substantial evidence on the record, the ALJ found Plaintiff capable of sedentary work.  Furthermore, the ALJ ultimately provided greater limitations than those found by Dr. Udomsaph, finding that Plaintiff could only occasionally, rather than frequently, balance, and that while Plaintiff would be able to sit for six hours, he could not sit for longer than one hour at a time and would need to stand or shift positions for two to three minutes while remaining on task.  (A.R. 20.)  Moreover, outside of Dr. Udomsaph's opinion, notably, the ALJ's RFC determination was also consistent with both Dr. Simpkins' opinion and Dr. Merola's functional report that Plaintiff was capable of sedentary work.  (A.R. 25, 57, 484.)  The ALJ did not err in considering Dr. Udomsaph's opinion.

22

In sum, after considering this evidence, as well as Plaintiff's other medical and testimonial records, the ALJ found that, prior to November 28, 2019, Plaintiff had the RFC to perform sedentary work with certain limitations.  (A.R. 20.)  As such, it is clear that the ALJ's RFC determination was based on more than the "mere scintilla" needed to meet the substantial evidence standard.  *McCrea*, 370 F.3d at 360.

### B. The ALJ Properly Evaluated Plaintiff's Subjective Complaints

Plaintiff argues that the ALJ failed to address Plaintiff's subjective complaints, corroborated by Dr. Elbaz's treatment notes, that Plaintiff's pain medications made him drowsy, sleepy, and dizzy.  Pl. Br. at 15-16.  Plaintiff asserts that these complaints indicated that the side effects would render him unable to drive to work or function in the workplace.  *Id*.  Defendant disagrees, and contends that the ALJ, indeed, considered Plaintiff's symptoms, and further, that Plaintiff has mischaracterized the strength of the purported corroborating medical evidence.  Def. Opp. Br. at 17-18.  I find that the ALJ properly considered Plaintiff's subjective complaints.

A claimant's subjective symptoms must be corroborated by objective medical evidence; *i.e.*, evidence of a medically determinable impairment that can reasonably be expected to produce the claimant's underlying symptoms.  *See Hartranft*, 181 F.3d at 362 (citing 20 C.F.R. § 404.1529).  The most recent Social Security Ruling within this context, SSR 16-3p, 2016 WL 1119029, effective March 16, 2016, describes a two-step process that ALJs are required to follow in evaluating a claimant's statements about symptoms.  SSR 16-3p, 2016 WL 1119029.

First, the ALJ "must consider whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce an individual's symptoms, such as pain."  SSR 16-3p, 2016 WL 1119029 at *3.  "Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce an individual's

symptoms is established, [the ALJ] evaluate[s] the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities . . ." *Id.* at *2. If the ALJ finds that the objective medical evidence does not substantiate the claimant's testimony about his or her symptoms, then the ALJ is required to make a determination on the basis of the entire record by considering: (1) The claimant's daily activities; (2) the location, duration, frequency and intensity of the claimant's pain or other symptoms; (3) precipitating or aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms; (6) any measures the claimant uses or has used to relieve pain or other symptoms; and (7) other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 416.929(c)(3)(i)-(vii).

As an initial matter, there is little corroborating medical evidence that Plaintiff can neither drive nor work due to side effects from medication. In fact, Plaintiff's claim rests on a single line in Dr. Elbaz's treatment notes from April 4, 2018, where Plaintiff "[a]dmits drowsiness from" Tramadol. (A.R. 418.) Notably, as Defendant points out, this is immediately contradicted by Dr. Elbaz's treatment notes from a visit less than two weeks later, which state that Plaintiff's medications "provide moderate relief without any significant side effects." (A.R. 456.) Regardless, here, the ALJ properly considered Plaintiff's subjective complaints and determined that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not fully supported" by the record, and as such, "the symptoms do not cause the degree of limitation alleged." (A.R. 24.) In so finding, the ALJ

24

expressly discussed Plaintiff's subjective complaints related to his pain and the side effects of his medication.  Specifically, the ALJ considered Plaintiff's testimony that he had low back and knee pain, that his pain was a 7 or 8 out of 10, that he underwent pain management treatment from doctors, that he was taking medication and injections for that pain, and that he admitted to getting dizzy from those pain medications.  (A.R. 24, 41.)  As to his ability to drive, the ALJ noted that Plaintiff was, indeed, capable of driving.  (A.R. 24.)  Plaintiff stated to Dr. Merola that he could occasionally drive, and explained to the ALJ that he had a driver's license and was capable of driving short distances.  (*Id*.)  Considering this evidence, as well as other treatment-related evidence throughout the Opinion discussed *supra*, the ALJ found that Plaintiff was capable of sedentary work.  (A.R. 20.)  As such, in light of Plaintiff's lack of corroborating evidence regarding the effects of his medication, and the thorough analysis of the total medical record, it is clear that the ALJ's decision to discount Plaintiff's subjective complaints regarding the side effects of his treatment was based on substantial evidence.

## IV.  <u>CONCLUSION</u>

For the reasons set forth above, the ALJ's decision is **AFFIRMED**. An appropriate order shall follow.

Date: March 9, 2022

<u>/s/ Freda L. Wolfson</u>
Freda L. Wolfson
U.S. Chief District Judge